UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
HAMMOND DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| | ) | |
| v. | ) | NO. 2:06-CR-2 PS |
| | ) | |
| | ) | |
| JERRY CYPRIAN, | ) | |
| | ) | |
| Defendant. | ) | |

**OPINION AND ORDER**

Before the Court is Defendant Jerry Cyprian's motion to suppress. [DE 11] For the reasons that follow, Cyprian's motion is denied.

**BACKGROUND**

Defendant Jerry Cyprian is currently charged with being a felon in possession of a firearm, 18 U.S.C. § 922(g)(1); a felon in possession of ammunition, *id*.; possession with intent to distribute marijuana, 21 U.S.C. § 841(a)(1); and possession of a firearm in furtherance of a drug trafficking crime, 21 U.S.C. § 924(c). Although the amounts of marijuana involved in the case appear to be minimal, the penalties Cyprian faces are not. If Cyprian is convicted, the §924(c) count carries a five-year mandatory minimum in addition to any sentence imposed for the other offenses.

On October 25, 2005, Sergeant Tyrone Douglas of the Lake County Police Department and Gary Police Detective Willie McLemore were conducting surveillance and investigating criminal activity in the Glen Park area of Gary, Indiana. Glen Park is regarded as a high crime area and often has been the site of drug trafficking, gang activity, and shootings. Neither

Douglas nor McLemore is a law enforcement rookie. Sergeant Douglas has been with the Lake County Police Department for over eighteen years. Detective McLemore has been with the Gary Police Department for seven years. Both men serve on the Gang Response Investigation Taskforce (GRIT), a federal law enforcement program comprised of federal and local law enforcement personnel. McLemore and Douglas have substantial experience investigating "street-level" drug dealing and "hand-to-hand" drug transactions. According to McLemore and Douglas, "street level" and "hand-to-hand" drug transactions occur quickly and typically take place at dwellings or in public places such as gas stations or commercial parking lots.

On the evening in question, Detective McLemore was alone in an unmarked police car headed north on Broadway Avenue, a major, four-lane thoroughfare in Gary. Sergeant Douglas was nearby in another unmarked police car. At approximately 10:30 p.m., McLemore was stopped at a traffic light at the intersection of Broadway Avenue and Ridge Road when he observed Cyprian's sport-utility vehicle turn north onto Broadway Avenue. McLemore observed Cyprian change lanes without using his turn signal. When the light facing McLemore turned green, McLemore caught up to Cyprian and paced him at 45 miles per hour (at least 10 miles per hour above the speed limit). Cyprian then turned left off of Broadway and onto 36th Street, and then left again into the parking lot of a Rally's fast-food restaurant, which sits on the southwest corner of Broadway and 36th Street.

Cyprian parked his vehicle at the south end of the Rally's parking lot. As McLemore circled the Rally's, he observed a male subject leaving the restaurant and walking toward Cyprian's car. When McLemore returned to Broadway to re-establish surveillance on Cyprian, McLemore observed the male subject get into Cyprian's vehicle on the passenger side. From

McLemore's point of view, the male subject had nothing in his hands when he entered Cyprian's vehicle. The subject remained in Cyprian's car for a short period before exiting and returning to the Rally's restaurant.

Cyprian proceeded to pull out of the Rally's parking lot and turn left (north) onto Broadway. McLemore had radioed Sergeant Douglas and described the surveillance of Cyprian. Douglas put himself in position to "have the eye on" Cyprian (*i.e.* keep Cyprian in view) until McLemore caught up, passed Douglas, and ultimately regained sight of Cyprian on Broadway. McLemore then tailed Cyprian for multiple blocks as Cyprian approached the entrance ramp for Interstate 80/94. McLemore again observed Cyprian change lanes without using a turn signal. As Cyprian drove onto the entrance ramp, McLemore turned on his flashers and pulled Cyprian over. Sergeant Douglas, who had been following the others, also pulled over and parked his car behind McLemore's.

McLemore approached Cyprian's vehicle on the driver's side while Douglas walked along the passenger's side. McLemore asked Cyprian for his license and registration, which Cyprian provided. McLemore then asked Cyprian about his previous whereabouts. Cyprian said that he was on his way home from Rally's where he had ordered some french fries. McLemore asked Cyprian where the french fries were. Cyprian said he had eaten them but could not locate the box they came in. Because McLemore had not observed Cyprian order any food at Rally's (nor have any food brought to him), McLemore believed Cyprian was lying and inquired further. McLemore asked Cyprian if he had any drugs or weapons in his vehicle. Cyprian said he did not. McLemore then asked Cyprian for consent to search the vehicle. Cyprian obliged and exited the vehicle voluntarily. McLemore escorted Cyprian to either the front or the rear of the

3

vehicle.[1]  McLemore again asked Cyprian about searching the vehicle and Cyprian again consented.

Sergeant Douglas then searched the vehicle while McLemore and Cyprian continued their discussion at the side of the road.  Cyprian told McLemore that there was some marijuana in the center console of the vehicle.  When McLemore asked how much, Cyprian responded "a half-ounce."  McLemore asked Cyprian if there was any other contraband inside the vehicle.  Cyprian stated there also was a handgun in the center console.  When Douglas discovered the center console was locked, he asked Cyprian how to unlock it.  Cyprian directed Douglas to a key on Cyprian's keyring.  Douglas unlocked the console and seized the following items from the console:  14 grams of marijuana; several small plastic bags; a loaded handgun; two magazines loaded with ammunition; and a black, digital scale.

Douglas photographed the items and took them into custody.  Cyprian and McLemore meanwhile discussed other topics, including Cyprian's willingness to cooperate with law enforcement and Cyprian's criminal history.  Cyprian advised McLemore that he had a prior felony conviction for theft.  Ultimately, Cyprian left the scene in his own vehicle.  McLemore testified that the entire stop was relatively brief and at no point during the stop was Cyprian cuffed or restrained.

---

[1] McLemore's report of the incident indicates that Cyprian and McLemore walked to the rear of the vehicle.  [Def. Ex. HH]  At the hearing, however, McLemore testified that his report is inaccurate and that he and Cyprian in fact walked to the front of the vehicle.  Sergeant Douglas corroborated McLemore's testimony and stated that he observed Cyprian and McLemore at the front of Cyprian's vehicle.  Cyprian, on the other hand, testified that they walked to the rear of Cyprian's vehicle and stood in between his vehicle and McLemore's police car, which Cyprian estimated to be 8-10 feet away.  As explained below, the resolution of this factual issue has no bearing on the outcome of the motion.

**DISCUSSION**

Cyprian seeks to suppress the evidence seized from his vehicle and the statements he made to McLemore on October 25, 2005. Cyprian makes several arguments for suppression. First, Cyprian claims the officers lacked probable cause to stop him in the first place. Second, to the extent the stop was an investigative stop under *Terry v. Ohio*, 392 U.S. 188 (1968), Cyprian asserts that the officers exceeded the scope of the *Terry* stop by ordering Cyprian out the vehicle and questioning him about non-traffic matters. Finally, Cyprian argues that he was subjected to a custodial interrogation on the side of the road in violation of *Miranda v. Arizona*, 384 U.S. 436 (1966). The Court addresses Cyprian's arguments in order.

**A. The Fourth Amendment Issues**

The Fourth Amendment protects individuals from "unreasonable searches and seizures." U.S. CONST., amend. IV. Automobile or traffic stops constitute the seizure of a person; therefore, they must be reasonable to pass constitutional muster. *See Whren v. United States*, 517 U.S. 806, 189 (1996). Generally speaking, a traffic stop is reasonable if the police have probable cause to believe a traffic violation occurred. *Id*. "Ulterior motives do not invalidate a police stop for a traffic violation, no matter how minor, if a motor vehicle law infraction is detected." *United States v. Murray*, 89 F.3d 459, 461 (7th Cir. 1996). Indiana traffic laws require a driver to activate his turn signal at least 200 feet before he turns or changes lanes. *See* IND. CODE § 9-21-8-25 ("A signal of intention to turn right or left shall be given continuously during not less than the last two hundred (200) feet traveled by a vehicle before turning or changing lanes.").

McLemore clearly had probable cause to stop Cyprian for a traffic offense. McLemore testified that he observed Cyprian on multiple occasions change lanes without signaling. Although Cyprian testified that he did not change lanes without signaling, the Court finds the testimony of Detective McLemore more credible. Based on this finding, McLemore had probable cause to stop Cyprian. *See United States v. Jackson*, 377 F.3d 715, 716 (7th Cir. 2004) (officer had probable cause to stop defendant who had changed lanes without signaling).

Both the government and Cyprian urge that the traffic stop in this case ought to be evaluated as a *Terry* stop. Under this framework, Cyprian alleges that the stop was unconstitutional because it was not reasonably related in scope to the circumstances which justified the stop in the first place (*i.e.* the traffic violations). Both parties cite *United States v. Green*, 111 F.3d 515, 518 (7th Cir. 1997), which states that "a traffic stop is similar to an investigative detention and is thus governed by [*Terry*]." Although *Green* has not been overturned, the Seventh Circuit in recent years has expounded on the differences between traffic stops supported by probable cause and *Terry* stops, as well as how the two should be analyzed for purposes of the Fourth Amendment.

*Terry* does not govern a traffic stop supported by probable cause. *United States v. Childs*, 277 F.3d 947, 953 (7th Cir. 2002); *Whren v. United States*, 517 U.S. 806, 811-13 (1996); *United States v. Carpenter*, 406 F.3d 915, 916 (7th Cir. 2005). Although traffic stops usually proceed like *Terry* stops, "the Constitution does not require this equation." *Childs*, 277 F.3d at 953. "Probable cause makes all the difference – and as *Whren* [] shows, traffic stops supported by probable cause are arrests, with all the implications that follow from probable cause to believe that an offense has been committed." *Id*. at 953. The Supreme Court acknowledged this

6

distinction many years ago. *See Berkemer v. McCarty*, 468 U.S. 420, 439 n. 29 (1984) ("We of course do not suggest that a traffic stop supported by probable cause may not exceed the bounds set by the Fourth Amendment on the scope of a *Terry* stop.").

McLemore had probable cause to conduct a traffic stop of Cyprian, and once there is probable cause to support a traffic stop, an officer may question a subject on areas unrelated to the stop. *See United States v. Muriel*, 418 F.3d 720, 725 (7th Cir. 2005) (officers conducting a traffic stop based on probable cause "need not have reasonable suspicion to ask questions unrelated to the purpose of the traffic stop"). That is what occurred here.

That being said, an officer with probable cause to make a traffic stop does not have *carte blanche* to do whatever he pleases. As the Supreme Court recently noted, "a seizure that is lawful at its inception can violate the Fourth Amendment if its manner of execution unreasonably infringes interests protected by the Constitution." *Illinois v. Caballes*, 543 U.S. 405, 407 (2005). For instance, in the case of a traffic stop, "[a] seizure that is justified solely by the interest in issuing a warning ticket to the driver can become unlawful if it is prolonged beyond the time reasonably required to complete that mission." *Id*. The Seventh Circuit has emphasized that the length of detention following a traffic stop based on probable cause must be reasonable. *See Muriel*, 418 F.3d at 725; *Carpenter*, 406 F.3d at 916; *Childs*, 277 F.3d at 954 ("What the Constitution requires is that the entire process remain reasonable."). Questions that prolong the length of the stop may affect the reasonableness of the detention. *Muriel*, 418 F.3d at 725.

Here, the officers' conduct during the stop, including the questions McLemore posed to Cyprian, did not render the stop unreasonable. Matters moved swiftly that night. McLemore

7

and Douglas approached Cyprian's car and told him why he was being pulled over. They asked for his license and registration. Within a matter of a few seconds, they were suspicious of Cyprian. For starters, Cyprian had just been seen in a high crime area acting peculiarly. He pulled into a fast-food restaurant parking lot; he never got out of his car to order any food, but another person entered his car and then exited just as quickly. This occurred in an area where hand-to-hand drug transactions frequently occur. Suspicion was heightened when McLemore asked Cyprian where he was going. Cyprian said he was on his way home after stopping for some french fries at the Rally's. But this was fishy. There were no fries in his car, nor was there an empty box. Moreover, McLemore never observed Cyprian get out of his car while he was at the Rally's or have any food brought to him. All of this made McLemore even more suspicious of Cyprian's behavior. McLemore therefore asked Cyprian whether he had any drugs or guns in his car. When Cyprian said no, McLemore asked to search the car. Cyprian said that they could. This entire sequence occurred in matter of a few minutes. None of the questions posed by McLemore created any substantial inconvenience to Cyprian. *See Childs*, 277 F.3d at 954 ("Questions that hold potential for detecting crime, yet create little or no inconvenience, do not turn reasonable detention into unreasonable detention.")

Moreover, the consent to search was voluntary. Law enforcement officers, without a warrant or in the absence of any probable cause, may conduct a search based upon an individual's voluntary consent, and any evidence discovered during the consent search may be seized and used during a subsequent prosecution. *Schneckloth v. Bustamonte*, 412 U.S. 218, 219 (1973); *United States v. Raibley*, 243 F.3d 1069, 1077 (7th Cir. 2001). To determine whether consent was given voluntarily, courts examine the totality of the circumstances surrounding the

8

consent. *Raibley*, 243 F.3d at 1077. Factors in assessing voluntariness include, but are not limited to, the person's age, intelligence, education, and language ability. *Id.* at 1075-76; *United States. v. Zamoran-Coronel*, 231 F.3d 466, 469-70 (8th Cir. 2000); *United States v. Zuiba-Melendez*, 263 F.3d 1155, 1163 (10th Cir. 2001). The consent may be express or implied, but need not be knowing and intelligent, and may be given unintentionally and without knowledge of the right to refuse consent. *Schneckloth* 412 U.S. at 235-36; *United States v. Drayton*, 536 U.S. 194, 206-07 (2002); *United States v. Saadeh*, 61 F.3d 510, 518 (7th Cir. 1995) (consent to search voluntary even though suspect was not informed of right to refuse consent). The government has the burden of proving, by a preponderance of the evidence, that the consent was freely and voluntarily given. *Schneckloth*, 412 U.S. at 227.

Here, Cyprian voluntarily consented to the search of his car in general and the vehicle's console in particular. Both officers testified credibly that McLemore asked Cyprian if they could search his car and he responded that they could. Guns were not drawn; no threats were made; voices were not raised; and the atmosphere was a calm one. There is nothing about Cyprian's age and intelligence that would suggest that his will was somehow overcome and the consent was involuntary. Once the search began, Cyprian then volunteered that there were drugs and a gun in the console and that the key for it was on the key ring. Thus, through the testimony of McLemore and Douglas, the government met its burden and proved by a preponderance of the evidence that Cyprian's consent was voluntary. *See United States v. Mendoza*, 438 F.3d 792, 796 (7th Cir. 2006).

In sum, the initial traffic stop was supported by probable cause. The brief questioning that immediately followed was reasonable under the circumstances and the officers lawfully

9

obtained Cyprian's consent to search the car. McLemore asked Cyprian on two separate occasions whether he and Douglas could search the car and both times Cyprian consented. Once Cyprian voluntarily consented to the search of his car (and did not revoke the consent), the police had the right to conduct a search. Then, in the midst of the search, Cyprian volunteered that there were drugs and a gun in the console. At this point, in the face of an admission, there was plainly probable cause to detain Cyprian and all bets were off. On this record, the Court cannot find any violation of Cyprian's rights under the Fourth Amendment.

      **B.**      **The Fifth Amendment Issues**

In *Miranda v. Arizona*, 384 U.S. 436 (1966), the Supreme Court recognized that custodial interrogations place "inherently compelling pressures" on individuals being interrogated. *Id*. at 467. Consequently, any statements made during a custodial interrogation by a person who has not been informed of, and waived, his privilege against self-incrimination and his right to counsel are not admissible in a criminal proceeding. *Id*.; *United States v. Peterson*, 414 F.3d 825, 828 (7th Cir. 2005); *United States v. Lee*, 413 F.3d 622, 625 (7th Cir. 2005). Thus, two requirements for any *Miranda* challenge are: 1) interrogation of the defendant; 2) while he was in custody. If either element is lacking, then there is no need for *Miranda* warnings to have been issued. *Id*.

The Supreme Court has defined custodial interrogation as "questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way." *Miranda*, 384 U.S. at 444; *Oregon v. Mathiason*, 429 U.S. 492, 495 (1977) (Miranda warnings required "only where there has been such a restriction on a person's freedom as to render him 'in custody'"). In deciding whether a defendant is in

custody, courts look at the totality of the circumstances and ask whether a reasonable person in the defendant's position would have felt "at liberty to terminate the interrogation and leave." *A.M. v. Butler*, 360 F.3d 787, 795 (7th Cir. 2004), *citing Thompson v. Keohane*, 516 U.S. 99, 112 (1995). "[T]he initial determination of custody depends on the objective circumstances of the interrogation, not on the subjective views harbored by either the interrogating officers or the person being questioned." *Stansbury v. California*, 511 U.S. 318, 323 (1994).

Persons temporarily detained pursuant to a traffic stop are not "in custody" for purposes of *Miranda*. *Berkemer*, 468 U.S. at 440. However, if a motorist detained at a traffic stop is later subjected to treatment that renders him "in custody" for practical purposes, he is then entitled to the full panoply of protections prescribed by *Miranda*. *Id*.

In *United States v. Murray*, 89 F.3d 459 (7th Cir. 1996), the defendant was stopped for a traffic violation and was placed in the backseat of squad car. In response to questioning in the squad car, the defendant made incriminating statements. Under these circumstances, the court found that he was not in custody because there was no evidence that the defendant's freedom of movement was restrained prior to questioning in a manner equivalent to that associated with a formal arrest. This was due, in part, to the fact that only a brief period of time had elapsed between the initial stop and questioning, the encounter occurred in a public place, and there was no evidence that officers engaged in conduct which might have overborne the defendant's will. *Id*. at 462; *see also United States v. Kelly*, 991 F.2d 1308, 1312 (7th Cir. 1993) (the roadside questioning of a driver stopped for speeding, after an officer found drug paraphernalia and marijuana residue in the car, did not constitute "custodial interrogation" for *Miranda* purposes).

Cyprian was not in custody for purposes of *Miranda*. After consenting to a search of his car, Cyprian exited his vehicle voluntarily and stood unrestrained at the side of the road while he spoke to Detective McLemore. Cyprian was never handcuffed or restrained at any time during the stop. Although Cyprian contends that he was standing in between his car and McLemore's car while he was questioned, his position on the roadside makes no material difference in this case. Even if the Court were to accept Cyprian's version of the facts, merely standing in between two cars parked eight to ten feet apart is not a significant restriction of one's freedom for *Miranda* purposes.

Finally, at the hearing Cyprian argued that, unlike in *Murray,* this stop was executed in a remote location that was not nearly as "public" as it could have been had McLemore stopped Cyprian on Broadway before he reached the entrance ramp to the highway. Therefore, Cyprian argues, he should be deemed to have been in custody due in part to the location of the stop. This is a stretch. The stop in this case took place at an on-ramp leading from one of the most major thoroughfares running through the city of Gary (Broadway) and onto a major interstate highway (80/94). It is difficult to see how a stop at this location could be deemed more "custodial" than a stop anywhere else on Broadway.

## **CONCLUSION**

For the foregoing reasons, Defendant Jerry Cyprian's Motion to Suppress [DE 11] is **DENIED**.

    **SO ORDERED.**

ENTERED: July 14, 2006

                                        s/ Philip P. Simon
                                        PHILIP P. SIMON, JUDGE
                                        UNITED STATES DISTRICT COURT